### [No. 1820.]

### W. F. Morris *v.* The State.

1. Forgery — Indictment.— If an indictment for forgery sets out *in hæc verba* the instrument alleged to have been forged, and the instrument is of such a character that, if genuine, it would have created, increased, diminished, discharged, or defeated any pecuniary obligation, it is not necessary to allege that such would be the effect of the instrument if it was genuine.
2. Same.— Though an indictment for passing or attempting to pass a forged instrument as true must allege that the inculpatory act was "knowingly" done, yet, as the word *knowingly* is not used in the statutory definition of forgery, an indictment for the latter offense need not so allege.
3. Same — Case Stated.— A telegram requesting a bank to honor a draft upon the sender is an instrument which, if genuine, imports upon its face a pecuniary obligation; and if an indictment for the forgery of such a telegram sets out the same *in hæc verba*, as was done in this case, then there was no occasion to allege that the same, if genuine, would have created such an obligation.
4. Practice — Bill of Exceptions.— Article 1363 of the Revised Statutes requires that every bill of exceptions shall be presented to the trial judge during the term, and within ten days after the conclusion of the trial. This article applies in criminal as well as civil causes, and when the record shows disregard of its mandate the bill of exceptions is nugatory.

Appeal from the District Court of Bexar. Tried below before the Hon. G. H. Noonan.

Appellant was charged with the forgery of a telegraphic dispatch purporting to be the act of the Indiana National Bank, and to have been addressed to the Traders' National Bank, San Antonio, requesting the latter bank to honor W. F. Morrison's draft on the former

for $2,500. The appellant was found guilty, and a term of six years in the penitentiary was assessed as his punishment. A new trial being refused him, he appealed.

The charging part of the indictment is as follows: "That W. F. Morris, on the twenty-fifth day of the month of June, in the year of our Lord one thousand, eight hundred and eighty-four, in said county of Bexar, and State of Texas, with force and arms, and without lawful authority, and with intent to defraud, wilfully, feloniously and falsely then and there did make a certain false instrument in writing purporting to be the act of the Indiana National Bank, said bank then and there being duly incorporated under and by virtue of the laws of the United States of America; which said false instrument in writing is as follows, that is to say:

"Form No. 1. The Western Union Telegraph Company. This company transmits and delivers messages only on conditions limiting its liability which have been assented to by the sender of the following message. Errors can be guarded against only by repeating a message back to the sending station for comparison, and the company will not hold itself liable for errors or delays in transmission or delivery of unrepeated messages beyond the amount of tolls paid thereon, nor in any case where the claim is not presented in writing within sixty days after sending the message.

"This is an unrepeated message, and is delivered by request of the sender under the conditions named above.

"Thos. T. Eckart, General Manager.

"Norvin Green, President.

| "Number | Sent by | Rec'd by | Check |
| 65 | C. | J. M. | 13 Paid. |

Received at 12.05 A. M.—— 6 — 25 — 1884
Dated Indianapolis, Indiana, 24
  "To Traders' Natl. Bank,
      "San Antonio:
        "Please honor W. F. Morris's draft on us for twenty-five hundred dollars.
          "Indiana Natl. Bank.

"Said W. F. Morris then and there feloniously and falsely did make said false instrument in writing, with the felonious intent then and there to defraud; contrary," etc.

J. S. Thornton, cashier of the Traders' National Bank, San Antonio, Texas, was the first witness for the State. He testified that he first met the defendant on June 20, 1884, at the said bank. Defendant introduced himself and inquired if witness had a telegram

from a bank in Indiana to pay him a sum of money.    Witness told him he had no such telegram.    Defendant called again the next day and asked the same question.    Witness had then received no such telegram, and remembered no conversation then between himself and defendant.    About twenty-four hours afterwards the defendant telephoned witness from the Menger Hotel, and witness answered him that no telegram had been received.    About two hours later a telegram was received at the bank, and witness rang for the defendant at the Menger Hotel, and in about half an hour the defendant came to the bank, which is about ten minutes' walk from the hotel. He asked for the telegram.    The bank had received a telegram purporting to come from the Indiana National Bank, of Indianapolis, Indiana, and instructing the Traders' National Bank to honor the draft of W. F. Morrison for $2,500.    Defendant said that this was the telegram he had been looking for.    Witness asked him to bring some one to identify him.    He replied that he had no acquaintances, but proposed to bring the proprietor of a certain saloon.    Witness replied that a customer of the bank would be preferred.    Just then Mr. Guy Borden stepped in and identified the defendant.    At this stage of the examination a telegram was shown to the witness, and he said it was the same one of which he had been speaking, and the one which the defendant said he was expecting.    Witness asked the defendant if he was dealing in live stock, and he replied that he was, and that he was going to a town south of San Antonio to ship horses from there.    He said that he would not need all of the money, and would leave $300 with the bank for expenses on his return. Witness then paid the defendant $2,190.65, and retained the balance of $9.35 for exchange.    In accordance with the telegram, the bank then took the defendant's draft in duplicate for $2,500 on the Indiana National Bank of Indianapolis.    Defendant signed both the duplicates.    One of the duplicates being shown to the witness, he stated that it was the one which had been sent to the Indiana National Bank.    It was returned protested.    No money on it had been received by the Traders' National Bank.    The Indiana National Bank would not pay it.

At this point the telegram was put in evidence to the jury.  Its purport has already been given in setting forth the indictment.

The witness Thornton testified that it was after the receipt of the telegram that the duplicate draft was drawn by defendant on the Indiana National Bank.  The telegram was brought to the Traders' National Bank by a young boy who looked very much like a telegraph boy.    Witness could not remember who the boy was, and

could not say that he was not a telegraph boy. The boy had a telegraph receipt book, and the witness receipted in it for the telegram. In reply to a question of the witness, the defendant said he had known Mr. Guy Borden in Galveston. After the lapse of sufficient time for the remitted duplicate to reach the Indiana National Bank in course of mail, a telegram was received to the effect that no such man as defendant was known by said bank, and no money of such a man had been received. Before this telegram was received by the Traders' Bank in San Antonio, the witness had commenced search for the defendant. This search was made about noon of the day after defendant got the money, and was instituted in consequence of information derived from J. L. Newton, manager of the Western Union Telegraph Company at San Antonio. Witness, accompanied by City Marshal Shardein and Deputy Marshal Hughes, went to Fort Allen, a San Antonio bagnio, and there they got a clue which directed them to the depot of the International railroad. On information there received, Marshal Shardein went to Monterey, Mexico, after the defendant, and witness next saw the defendant in the San Antonio jail. Defendant was brought back on the charge made against him by the witness.

On cross-examination the witness stated that he could not say that the telegram set forth in the indictment was a forgery, but knew that the defendant forged it, because the defendant told witness so in jail.

Dave Alexander was the second witness for the State. He was fifteen years of age, and in the summer of 1884 he first saw the defendant, who met him on the street and asked him to take a message to the Southern Hotel. Witness was a telegram carrier for the Western Union Telegraph Company. Defendant told witness that he wanted out of witness's book a sheet on which people wrote their names; that he wanted to put a name on it, and wanted witness to rub the name out after delivering the message. Witness refused to deliver the message. Afterwards, but on the same day, the witness saw the defendant in the telegraph office, where the defendant remained for about half an hour. Witness's sheet was on the table when the defendant came into the office, but when the defendant left, the sheet was not there, and witness had never seen it since. About an hour and a half afterwards witness met up with the defendant, and spoke to him about the sheet. He said he did not have it. Later on the same day, the witness heard of the delivery of the telegram at the Traders' Bank.

J. L. Newton, for the State, testified that he was the manager of

the Western Union Telegraph Company, at San Antonio. The witness being shown the telegram alleged to be forged, he said that a record was kept of all telegrams going through the San Antonio office of the company. He had made an examination of the record and found no such telegram as the one shown him. The telegram in question never passed through the San Antonio office of the telegraph company, though it is written on the same sort of a blank form as is used by the company. One of the delivery sheets was missing on the day the forged telegram was received by the Traders' Bank. Mr. Thornton showed to the witness the telegram he had received, it being the same one now shown witness. A few days previous, the witness had seen the defendant. Witness having heard that the defendant had tried to get one of the telegraph boys to carry a message, and having also learned that one of the blanks was missing, he suspected that something was wrong, and he went to every bank in San Antonio and notified them. When he got to the Traders' National Bank, the telegram in question was shown to him by Mr. Thornton, and witness told him that no such a telegram as that had passed through the San Antonio office. Witness had seen the defendant about the office, and had ordered him out of it, but did not see him there during the day on which the message purports to have passed through the office. The message sheet of Dave Alexander was missing the same day the said telegram bears date.

The State recalled J. S. Thornton, who, on being again shown the telegram in question, identified it as the same one shown by him at the Traders' National Bank to J. L. Newton, the preceding witness. As soon as witness showed the telegram to Newton, they went together to the telegraph office. Defendant never called for the $300 left on deposit. He is known as a telegraph operator, and witness believed he was one.

James Ryan, for the State, testified that on June 20, 1884, he was engaged in the Western Union telegraph office at San Antonio. Dave Alexander was at that time a messenger boy in the office. Defendant looks like a fellow who was frequently in the office about that date, but witness would not positively say he was the same man. Dave Alexander's message sheet was missing about the same time. The man of whom the witness was speaking went by the name of Morrison. When the witness went out to dinner, the said Morrison was seated in one of the chairs near the receiving messenger's table. Witness was in charge of the messenger boys, and when he returned from his dinner it was reported to him that Dave Alexander's messenger sheet was missing. The messengers' sheets

were kept inside the railing, and the seat in which Morrison was sitting was also inside the railing. He was admitted inside the railing because he had been a telegraph operator. Receiving blanks are kept on the operator's table, and are not kept outside of the railing. Witness had seen Morrison inside the railing more than once.

Cross-examined, the witness stated that persons not connected with the office were sometimes permitted to come behind the railing. Even newspaper reporters had been allowed there.

A. J. Long, for the State, testified that he was telegraph operator in San Antonio from 24th to the 26th of June, 1884, at which dates and prior thereto he was acquainted with the defendant, having met him at Houston between the first of April and the last of May, 1884. At that time the defendant was a telegraph operator of the Western Union Telegraph Company, and witness was the receiver of night dispatches. In June, 1884, witness had a private mark on messages received at San Antonio. The private mark was J. M. When witness first became acquainted with the defendant both of them were telegraph operators. They worked in the same office for five or ten days, and defendant then had frequent opportunities of seeing the witness write messages. In June, 1884, witness saw the defendant in the office of the Western Union Telegraph Company at San Antonio, and saw him inside the railing on one or two occasions. Examining the telegram involved in this case, the witness stated that he did not receive it, and the mark on it was not his; nor did it have on it the receiving number or the office call. It is not in witness's handwriting. It is written on a receiving blank, which is different from a sending blank, and it purports to be a day message. All commercial telegrams like this were received by the witness, and this fact was known to the defendant. The blanks are kept lying around on the tables inside the railing, and a delivery sheet was missing about the dates mentioned, as witness heard when this Morris matter came to his knowledge.

On his cross-examination the witness stated that he did not know that the blank on which the telegram appears was abstracted from the office of the Western Union Telegraph Company at San Antonio, nor did not know that the defendant took the blank from the office. Friends were sometimes admitted behind the railing, and other persons besides the defendant may have been there during the time he was there. Other operators could have taken the blank as easily as the defendant. Five men and four boys were entitled to access behind the railing at the time. Three or four news reporters visited the office, and they were allowed behind the railing. De-

fendant was about the office for some three weeks.   Witness did not know the defendant's handwriting or signature.

E. P. Claudon, for the State, testified as an expert in handwriting. Comparing the telegram in question with the defendant's signatures to the duplicate drafts he gave on the Indiana National Bank, the witness pointed out a number of particulars in which there were striking similarities between them, and it was his opinion as an expert that there was a great similarity throughout.   On cross-examination he pointed out several particulars in which there were differences between the writing in the telegram and the signatures to the drafts, and he could not say that the same person wrote the signatures and the telegram.

M. Freeborn also testified for the State as an expert in handwriting.   The result of his comparison was about the same as that of the preceding expert.

The State having closed with the foregoing evidence, the defense introduced two witnesses who knew the defendant in Houston and Galveston in 1884, and who knew his handwriting.   They could see no similarity between his handwriting and that of the telegram in question, and did not think the telegram was written by him.

During the trial the defendant's attorney objected to many parts of the testimony admitted in behalf of the State, and subsequently reserved a bill of exceptions based on the objections taken at the trial.   The questions raised in the bill of exceptions, however, are not noticed in the opinion of this court, because the bill itself was not perfected within the time prescribed by the statute.

The questions decided in the opinion arose upon exceptions taken by defendant's counsel to the sufficiency of the indictment.   After the affirmance of the conviction at Galveston, on the 20th of March, 1885, a motion for rehearing was filed by counsel for the appellant. The Galveston term being then about to expire, the motion and case were transferred to the ensuing term of the court at Austin; and there the motion was overruled without a written opinion.

*A. S. Chevalier*, for the appellant, filed an able brief and argument in support of the motion for rehearing.

· *J. H. Burts*, Assistant Attorney General, for the State. ·

White, Presiding Judge.   "An indictment for forgery need not charge that the forged instrument, if true, would create, increase, diminish, discharge or defeat any pecuniary obligation," etc.   This is the doctrine as broadly announced in *Horton* v. *The State*, 32

Texas, 79. The true rule is that "it is an indispensable element in the crime of forgery that the forged paper must be such that, if genuine, it may injure another, and it must appear from the indictment that it is legally of such a character, either from a recital or description of the instrument itself, or, if that alone does not show it to be so, then by the additional averment of such extrinsic facts as render it of that character." (*Costley* v. *The State,* 14 Texas Ct. App., 156, citing *State* v. *Briggs,* 34 Vermont, 501.)

In the case before us the instrument itself, which is set out *hæc verba* in the indictment, is of a character which, if genuine, would unquestionably have created a pecuniary obligation upon the " Indiana National Bank," and it so appears from the face of said instrument. In such a case it is unnecessary to allege that the instrument, if true or genuine, would have created such pecuniary obligation. (Penal Code, arts. 431, 437, 438.)

But it is said the indictment is fatally defective in that it fails to allege that the act was "knowingly" done. "Knowingly" is not a word used in our definition of forgery to characterize the offense. (Penal Code, art. 431.) It is an essential word in indictments for passing or uttering forged instruments (Penal Code, art. 443, and Bish. Crim. Proc., 3d ed., § 504), but not for forgery. This presentation disposes of all the questions in the case which we are now called upon to consider.

In so far as the purported bills of exception are concerned, they were not filed within proper time. The motion for new trial was overruled January 31, 1885, and the purported bills of exception were not filed until February 16, 1885,—six days after the expiration of the time within which the law permits the filing of the same. (*Harrison* v. *The State,* 16 Texas Ct. App., 325; *Cummins* v. *The State,* 12 Texas Ct. App., 121; *Keeton* v. *The State,* 10 Texas Ct. App., 686; Revised Statutes, art. 1363.)

We find no error in the record, and the judgment is therefore affirmed.

*Affirmed.*

[Opinion delivered March 20, 1885.]